*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JON GREGORY LANE, | ) | |
| | ) | Supreme Court No. S-16102 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-12-00403 CI |
| v. | ) | |
| | ) | O P I N I O N |
| CITY & BOROUGH OF | ) | |
| JUNEAU, | ) | No. 7238 – April 27, 2018 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Jeffrey J. Barber, Barber & Associates, LLC, Anchorage, for Appellant. Michael L. Lessmeier, Lessmeier & Winters, LLC, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.
STOWERS, Chief Justice, dissenting in part.

## I.     INTRODUCTION

A municipality kept a campground open through the winter to accommodate the local homeless population. A campground resident was shot and severely injured. He sued the municipality for damages, arguing primarily that the municipality did not do enough to prevent alcohol-related violence at the campground.

He also argued that the campground's caretaker performed his duties negligently, that this negligence precipitated the shooting, and that the municipality was vicariously liable for the caretaker's actions.

The superior court granted summary judgment for the municipality on all these claims. The court concluded that the municipality could not, under the doctrine of discretionary function immunity, be liable for any decision requiring "deliberation" and "judgment." It also concluded that the municipality was not vicariously liable for the caretaker's alleged negligence because his challenged actions were outside the scope of his employment.

The shooting victim appeals. We conclude that the application of discretionary function immunity to bar some of his claims was error, as they related to "operational" rather than "planning" decisions. We also conclude that genuine issues of material fact precluded summary judgment on the shooting victim's claims for negligent supervision and vicarious liability. We therefore affirm the superior court's judgment in part, reverse it in part, and remand the case for further proceedings.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

The City and Borough of Juneau (the City) maintained and operated Thane Campground, which in the summer was home to seasonal workers in the fishing and tourism industries. The City usually closed the campground for the winter, but in the fall of 2009 the City decided to keep it open to accommodate the local homeless population. According to Heather Marlow, the City official then in charge of the campground, the winter residents included alcoholics, the "chronically unemployed," and "people [who

were not welcome] in homeless shelters" because of "previous incidents or violence."

Marlow typically hired a caretaker to stay at the campground through the summer season. The caretaker's duties included keeping records, collecting rental fees, performing routine maintenance, and "interact[ing]" with campers. The caretaker was supposed to discourage noisy and disruptive behavior, but this duty stopped short of enforcing City ordinances or campground rules. The caretaker had no law-enforcement authority, and in the event of violence, "criminal activity," or other "unreasonable behavior" he was supposed to call the police rather than intervene. The caretaker could and occasionally did ask troublesome campers to leave the campground, but he could not enforce these requests without appealing to City authorities or calling the police.

Marlow hired Gordon Valle to serve as caretaker beginning in the summer of 2007. When the City decided in the fall of 2009 to keep the campground open, Valle agreed to stay on through the winter. Marlow had given him specific instructions regarding the consumption of alcohol at the campground. Although the campground rules expressly prohibited alcohol, Marlow testified it was "an understood premise" that Valle could drink in the privacy of his tent and should "turn a blind eye" to "minor" drinking by other campers as long as they did not "caus[e] a problem for others."

Jon Lane arrived at the campground in February 2010. On the evening of March 30, Lane and several other campers began drinking beer. Valle, believing he was "off the clock," joined the group and contributed money to replenish the beer supply. Valle and Lane both drank until they were heavily intoxicated; Valle stated that "alcohol . . . took [his] judgment away." At some point someone noticed that Valle had two pistols in his backpack. Valle testified that "[e]verybody wanted to look at" the guns, so he "passed them around." According to Lane, Valle and a camper named Chris Barrios took turns shooting (though Valle testified he could not remember whether he

fired a gun that night). Lane testified that Valle was "shooting up in the air and carrying on."

For reasons not clear from the record, an argument erupted between Lane and Barrios, who pointed one of Valle's pistols at Lane's head. Valle begged Barrios to "put the dang [gun] down" and said, "You're going to get me in so much trouble." But Barrios told him to "go while you can," and Valle ran away. Barrios then shot Lane in the face. Lane was seriously injured but survived.

## B.    Proceedings

Lane sued the City for damages under vaguely articulated theories of negligence and vicarious liability.[1] He alleged, among other things, that the City created an unreasonable and foreseeable risk of violence at the campground and then failed to warn him of the risk or otherwise protect him from it. He alleged that the City was negligent in hiring and supervising Valle. He also alleged that Valle himself acted negligently or recklessly, and that the City was vicariously liable for Valle's conduct.

The City moved for summary judgment. It argued that it was immune from liability under the discretionary function doctrine because its decisions to keep the campground open for the winter and to hire a particular individual as caretaker were "discretionary" actions involving "judgment" and "deliberation." The City argued in the alternative that it could not be held liable for the consequences of Barrios's intentional criminal act, and that Lane could not maintain a premises liability (or "failure to warn")

---

[1]     Lane's complaint named four defendants: the City, Valle, the owner of the land on which the campground was located, and the landowner's agent. Claims against the latter two defendants were dismissed by stipulation. The City brought a third-party claim against Barrios, but neither he nor Valle appeared, and the superior court entered default judgments against them both. Only Lane's claims against the City remained in contention on summary judgment.

claim because he was "solely responsible for his own safety." Finally, the City argued that Valle was an independent contractor rather than a City employee, and that the City could not be liable for his actions on the evening of the shooting because they were outside the scope of his contractual duties. Lane argued in opposition that discretionary function immunity did not apply to "operational" conduct like Marlow's supervision of Valle, that Valle was a City employee, and that the premises liability claims had merit because alcohol use at the campground created a foreseeable risk of violence.

The superior court agreed with the City and granted summary judgment on all of Lane's claims. Lane appeals, making two principal arguments: (1) that the superior court construed the City's immunity under AS 09.65.070(d)(2) too broadly; and (2) that the court erred when it concluded that Valle was not acting within the scope of his employment at the time of the shooting.

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo."[2] The party seeking summary judgment bears the initial burden of proving that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.[3] "Once the moving party has made that showing, the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact

---

[2] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014) (citing *Hurn v. Greenway*, 293 P.3d 480, 483 (Alaska 2013)).

[3] *Id.* at 517 (quoting *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008)).

exists.' "[4] Alaska has a "lenient standard for withstanding summary judgment,"[5] and we will affirm a grant of summary judgment only when "no reasonable person could discern a genuine factual dispute on a material issue."[6]

## IV. DISCUSSION

### A. "Discretionary Function" Municipal Immunity Is Provided By AS 09.65.070.

#### 1. The City enjoys immunity under AS 09.65.070(d)(2) for "planning" decisions; it does not enjoy immunity for "operational" acts.

Alaska Statute 09.65.070(d)(2) provides that "[a]n action for damages may not be brought against a municipality or any of its . . . employees if the claim . . . is based upon the exercise or performance" of "a discretionary function or duty." The superior court dismissed several of Lane's claims against the City because it concluded that this "discretionary function" immunity extends to any action requiring municipal employees to exercise "personal deliberation" and "judgment," relying on *Pauley v. Anchorage School District*.[7]

However, a *municipality's* immunity under AS 09.65.070(d)(2) is different from, and narrower than, a *municipal employee's* immunity under the same statute and

---

**4**    *Id.* (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

**5**    *Id.* at 520 (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

**6**    *Id.* (citing *Yurioff v. Am. Honda Motor Co.*, 803 P.2d 386, 389 (Alaska 1990); *Semlek v. Nat'l Bank of Alaska*, 458 P.2d 1003, 1007 (Alaska 1969); *Isler v. Jensen*, 382 P.2d 901, 902 (Alaska 1963)).

**7**    3l P.3d 1284, 1285 (Alaska 2001).

in the same circumstances.[8] "Discretionary" has a different meaning in the two different contexts. While municipal employees enjoy personal or "official" immunity for any action involving "deliberation" and "judgment,"[9] municipalities themselves enjoy immunity only for "planning" decisions; they remain potentially liable for "operational" decisions, that is, those which do not involve "policy considerations" and which comprise the "day-by-day operation[] of the [municipal] government."[10] Because some of our past decisions do not clearly distinguish between these two different yet closely related forms of discretionary function immunity, we take this opportunity to clarify the scope of municipal immunity under AS 09.65.070(d)(2). We begin with the history of the statute.

The Territory of Alaska had a statute waiving municipal immunity that continued after statehood in amended form. Without qualification or exception, the statute recognized tort claims "against any incorporated town . . . in its corporate character."[11] We interpreted this statutory waiver broadly, holding, for instance, that municipalities could be held liable for the negligence of their firefighters.[12] And we drew

---

[8]     *Compare Gates v. City of Tenakee Springs*, 822 P.2d 455, 459 (Alaska 1991) (discussing municipality's liability), *with Samaniego v. City of Kodiak*, 2 P.3d 78, 83 & n.11 (Alaska 2000) (discussing municipal employee's liability).

[9]     *Samaniego*, 2 P.3d at 83.

[10]     *State v. Abbott*, 498 P.2d 712, 720 (Alaska 1972) (quoting *Swanson v. United States*, 229 F. Supp. 217, 220 (N.D. Cal. 1964)); *Urethane Specialities, Inc. v. City of Valdez*, 620 P.2d 683, 687-88 (Alaska 1980).

[11]     *City of Fairbanks v. Schaible*, 375 P.2d 201, 207 (Alaska 1962) (citation omitted).

[12]     *Id.* at 208.

no distinction between "governmental" or "proprietary" functions.[13] Put simply, Alaska municipalities "did not enjoy any immunity from tort liability" during this time.[14]

This law remained in effect until 1977, when the legislature, responding to concerns that municipalities' ability to govern was hampered by threats of tort liability, partially restored municipal immunity.[15] The 1977 enactments included the language now codified at AS 09.65.070(d)(2), granting immunity for "discretionary" functions.[16] The current municipal immunity statute closely resembles the Alaska Tort Claims Act,[17] which protects the State from certain types of damages claims. Both statutes grant immunity for "discretionary" governmental functions; a difference is that the Tort Claims Act immunizes only the governmental entity (the State), while the municipal statute includes within its scope the "agents, officers, or employees" of a municipality.[18] For the State,

---

[13]    *Id.*

[14]    *Wilson v. Municipality of Anchorage*, 669 P.2d 569, 571 (Alaska 1983).

[15]    *See id.* at 571 n.4 ("AS 09.65.070 was . . . amended to confer immunity . . . for discretionary functions." (citing ch. 37, § 3, SLA 1977, codified as amended at AS 09.65.070(d)(2))); *see also J & L Diversified Enters., Inc. v. Municipality of Anchorage*, 736 P.2d 349, 352 (Alaska 1987) ("The statute was part of an enactment expanding municipal immunity in 1977 in response to several decisions of this court holding cities liable in hotel fires based on their fire inspection programs.").

[16]    *Wilson*, 669 P.2d at 571 n.4.

[17]    *See* AS 09.50.250(1).

[18]    *Compare* AS 09.50.250(1) ("A person . . . may bring an action against the state . . . . However, an action may not be brought if the claim . . . is an action for tort and is based upon . . . the exercise or performance [of] . . . a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."), *with* AS 09.65.070(d)(2) ("An action for damages may not be
(continued...)

official immunity for individuals came by way of the courts' recognition of the doctrine as an addition to the statutory protection for the governmental entity,[19] whereas for municipalities, both immunity for the entity and immunity for the individual are addressed expressly by the immunity statute.

Under the Tort Claims Act, the State's immunity does not extend to all discretionary actions, at least as the term "discretionary" is commonly defined.[20] In *State v. Abbott* we observed that the analogous discretionary function exception to the Federal Tort Claims Act had "been read so broadly on occasion . . . as to almost reinstate complete immunity."[21] We instead favored how the California Supreme Court, among others, had explained the exception: specifically that because "almost any act, even driving a nail, involves some discretion," we should reject "a simply semantic inquiry into the meaning" of the word "discretionary" and instead focus "on the policy behind the discretionary immunity doctrine for guidance in determining whether a given act was

---

[18]     (...continued)
brought against a municipality or any of its agents, offices, or employees if the claim . . . is based upon the exercise or performance [of] . . . a discretionary function or duty by a municipality or its agents, officers, or employees, whether or not the discretion involved is abused.").

[19]     *See Bridges v. Alaska Hous. Auth.*, 375 P.2d 696, 702 (Alaska 1962) (applying "the well recognized rule that affords [immunity from civil liability] to a public officer, acting within the scope of his official duties, for damages caused by a mistake by him in the exercise of judgment or discretion, or because of an erroneous interpretation and application of the law").

[20]     *State v. Abbott*, 498 P.2d 712, 720-22 (Alaska 1972).

[21]     *Id.* at 717 (citing *Dalehite v. United States*, 346 U.S. 15 (1953)).

discretionary or ministerial."[22] We approved of Justice Jackson's dissenting view — in a case involving the Federal Tort Claims Act — that "there is no good reason to immunize the Government or its officers from responsibility for their acts, if done without appropriate care for the safety of others."[23] Balancing the policy goals of the Tort Claims Act against our concern that a literal interpretation would excuse any form of governmental carelessness, we concluded that the State's planning functions enjoy immunity under the Act while its operational functions do not.[24] And because the municipal tort claims statute, AS 09.65.070(d)(2), is analogous to the Tort Claims Act at AS 09.50.250(1), we have concluded that the distinction between planning and operational functions applies in the municipal context as well.[25]

We have explained that planning decisions generally involve "the formulation of basic policy,"[26] while operational decisions either leave "no room for discretion or involve only discretion free from policy considerations."[27] This test admittedly requires "delicate judgment" to apply.[28] There is often no bright-line

---

[22]    *Id.* at 720 (citing *Johnson v. State*, 447 P.2d 352, 360 (Cal. 1968)).

[23]    *Id.* at 718 (quoting *Dalehite*, 346 U.S. at 60 (Jackson, J., dissenting)).

[24]    *Id.* at 721.

[25]    *Urethane Specialties, Inc. v. City of Valdez*, 620 P.2d 683, 687-89 (Alaska 1980).

[26]    *R.E. v. State*, 878 P.2d 1341, 1349 (Alaska 1994) (quoting *Indus. Indem. Co. v. State*, 669 P.2d 561, 563 (Alaska 1983)).

[27]    *Id.* (citation omitted).

[28]    *Abbott*, 498 P.2d at 721 (citing *Johnson v. State*, 447 P.2d 352, 360 (Cal. 1968)).

distinction between "planning" and "operation."[29] Courts must therefore inquire carefully into "the considerations that enter into" a government decision, and "appreciat[e] . . . the limitations on [a] court's ability to reexamine" executive action.[30]  But while policymaking is an immune governmental function, the implementation or execution of policy is not; the government remains potentially liable for mistakes in its "normal day-by-day operations."[31]  For example, "[o]nce the basic decision to maintain [a] highway in a safe condition throughout the winter is reached, the [S]tate" does not have "discretion to do so negligently."[32]

Municipal employees enjoy a different form of personal immunity under AS 09.65.070(d)(2).  We have observed that the statute, in extending immunity to agents, officers, or employees, establishes "a type of official immunity."[33]  And this official immunity is distinct from the sovereign immunity enjoyed by government entities.[34] Both forms of immunity employ the term "discretionary function," but "discretionary" carries

---

[29]     *See id.* ("In drawing the line between the immune 'discretionary' decision and the unprotected ministerial act we recognize both the difficulty and the limited function of such distinction.").

[30]     *Id.* (quoting *Johnson*, 447 P.2d at 360).

[31]     Id. at 720 (quoting *Swanson v. United States*, 229 F. Supp. 217, 220 (N.D. Cal. 1964)).

[32]     *Id.* at 722.

[33]     *Pauley v. Anchorage Sch. Dist.*, 31 P.3d 1284, 1285 (Alaska 2001); *see also Samaniego v. City of Kodiak*, 2 P.3d 78, 83 (Alaska 2000).

[34]     *See Aspen Expl. Corp. v. Sheffield*, 739 P.2d 150, 155 (Alaska 1987) (discussing the differences between sovereign immunity and official immunity).

a different meaning in the two different contexts.[35] For purposes of official immunity, we have defined "discretionary acts" as those requiring personal deliberation and judgment, and we have contrasted these with "ministerial acts," which "amount 'only to an obedience of orders, or the performance of a duty in which the officer is left with no choice of his own.' "[36] Municipal employees enjoy qualified immunity for discretionary acts but not for ministerial acts.[37] And because an individual employee's official immunity extends to all acts requiring personal deliberation and judgment, official immunity covers a greater range of actions than the discretionary function immunity of government entities; many acts are not planning or policy decisions and yet require personal deliberation and judgment on the part of the individual employee.[38]

The appropriate immunity analysis under AS 09.65.070(d)(2) therefore depends on whether the plaintiff brings a claim against a municipality or against its agent or employee. Either claim is governed by the same words in the same statute, but for the claim against the municipality we ask whether the challenged action carried out a

---

[35]     *See id.*

[36]     *State v. Haley*, 687 P.2d 305, 316 (Alaska 1984) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 132 (4th ed. 1971)).

[37]     *See, e.g.*, *Samaniego*, 2 P.3d at 83.

[38]     *Earth Movers of Fairbanks, Inc. v. State*, 691 P.2d 281, 285 n.2 (Alaska 1984) (Rabinowitz, J., concurring) (observing that "common-law individual immunity should sometimes be broader" than "the State's 'discretionary function' immunity" (citing *Owen v. City of Independence*, 445 U.S. 622 (1980))).

planning or operational decision,[39] whereas for the claim against the municipal employee we ask whether the decision in question involved personal deliberation and judgment.[40]

The difference between sovereign immunity and official immunity "reflects the differing policy considerations which underlie the two forms of immunity."[41] Discretionary function immunity for the State and municipalities serves three main policy goals: (1) respecting the separation of powers by limiting judicial oversight of coequal branches of government; (2) sparing courts the burden of investigating and evaluating the wisdom of executive or legislative decisions; and (3) protecting public resources from the demands of unlimited government liability.[42] We have adopted the view, however, that these objectives do not justify absolute immunity, and we have generally adhered to the "basic policy" that "when there is negligence," liability should be the "rule" and "immunity . . . the exception."[43]

---

[39] *See, e.g.*, *Adams v. City of Tenakee Springs*, 963 P.2d 1047, 1050 & n.3 (Alaska 1998); *Gates v. City of Tenakee Springs*, 822 P.2d 455, 459 (Alaska 1991); *Urethane Specialities v. City of Valdez*, 620 P.2d 683, 688 (Alaska 1980).

[40] *See, e.g.*, *Samaniego*, 2 P.2d at 83; *see also Aspen*, 739 P.2d at 155; *Haley*, 687 P.3d at 316.

[41] *Aspen*, 739 P.2d at 155.

[42] *State v. Abbott*, 498 P.2d 712, 721-22 (Alaska 1972) (citing Osborne M. Reynolds, Jr., *The Discretionary Function Exception of the Federal Tort Claims Act*, 57 GEO. L.J. 81, 121-23, 128-31 (1968)).

[43] *Id.* at 720 (quoting *Muskopf v. Corning Hosp. Dist.*, 359 P.2d 457, 462 (Cal. 1961)).

Official immunity responds to different policy concerns and protects different actors and interests.[44] Unlike sovereign discretionary function immunity, which insulates the policymaking functions of government, official discretionary function immunity protects individual government agents from the deterrent effects of personal liability.[45] We accept the traditional justification for official immunity, which acknowledges that the threat of individual liability, along with the attendant burdens of litigation in an individual capacity, tends to "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."[46]

But government employees are not completely insulated from the consequences of their actions. Official immunity in Alaska is qualified, not absolute; it applies only "when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt."[47] And we have not extended the personal immunity of government employees to automatically immunize their employers, having rejected the argument that the individual employee will be unacceptably restrained by the prospect of potential liability on the part of the employer.[48] We have instead adopted the

---

[44]     *See Aspen*, 739 P.2d at 155.

[45]     *Compare id.* at 157-58 (discussing the history and purpose of official discretionary function immunity), *with Abbott*, 498 P.2d at 717-22 (discussing the purpose of sovereign discretionary function immunity).

[46]     *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

[47]     *Aspen*, 739 P.2d at 158 (citing *Trimble v. City and Cty. of Denver*, 697 P.2d 716, 729 (Colo. 1985)).

[48]     *See Earth Movers of Fairbanks, Inc. v. State*, 691 P.2d 281, 282-84 (Alaska 1984) (analyzing separately the immunity of the State and the immunity of an individual State Trooper); *State v. Stanley*, 506 P.2d 1284, 1291-92 (Alaska 1973) (analyzing

(continued...)

view of the California Supreme Court that if "a deterrent effect takes hold" because of a government entity's potential liability, "it may be wholesome," because "the potential liability of a governmental entity, to the extent that it affects primary conduct at all, will . . . influence public employees" by "promot[ing] careful work."[49]

Some other jurisdictions follow a different approach, extending the government employee's official immunity vicariously to the government employer.[50] But we have held that what "constitutes a discretionary function for the purposes of official immunity" is not the same as "what constitutes a discretionary function for the purposes of sovereign immunity."[51] And as discussed above, sovereign immunity and official immunity serve different interests and promote different policy objectives; the difference

---

[48]    (...continued)
separately the immunity of the State and the immunity of individual State employees); *Bridges v. Alaska Hous. Auth.*, 375 P.2d 696, 702-03 (Alaska 1962) (holding that individual government defendants enjoyed official immunity but allowing plaintiffs to recover damages from the State).

[49]    *Johnson v. State*, 447 P.2d 352, 359-60 (Cal. 1968); *see Abbott*, 489 P.2d at 721 (recognizing *Johnson* as "a well-reasoned approach to the problem" of distinguishing between acts that are immune and those that are not).

[50]    *See, e.g.*, *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 663-64 (Minn. 2004) ("Generally, if a public official is found to be immune from suit on a particular issue, his or her government employer will be vicariously immune from a suit arising from the employee's conduct."); *Everitt v. Gen. Elec. Co.*, 932 A.2d 831, 847 (N.H. 2007) ("Official immunity, when available to individual public officials, generally may be vicariously extended to the government entity employing the individual, but it 'is not an automatic grant.' " (quoting *Sletten v. Ramsey Cty.*, 675 N.W.2d 291, 300 (Minn. 2004))).

[51]    *Aspen*, 739 P.2d at 155.

between the two forms of immunity "is more than mere semantics."[52] We therefore decline to follow these other jurisdictions, and we reiterate here that a municipality does not automatically share the protection of its employees' personal immunity.

Our cases have not always clearly distinguished between the two forms of discretionary function immunity. In at least two cases cited by the superior court, we analyzed claims against government entities using language appropriate to official rather than sovereign immunity, asking whether the actions in question involved "deliberation" and "judgment" and concluding that, because they did, the sovereign itself was immune.[53] Reframing the analysis is unlikely to have changed the results in those two cases, but we disavow their implication that when individual municipal employees act with discretion, the municipality is vicariously immune.

Applying this discussion to this case, we reject the City's argument that the challenged actions it took through Marlow, its employee, are immune under AS 09.65.070(d)(2) because she acted with "deliberation" and "judgment." Official immunity could protect her if she were an individual defendant. But Lane did not sue Marlow; he sued the City. A claim against a municipality or the State raises an issue of sovereign immunity, and the government defendant is immune only if the claim

---

[52] *Id.*

[53] *Pauley v. Anchorage Sch. Dist.*, 31 P.3d 1284, 1285-86 (Alaska 2001) (concluding that because a school principal, when deciding to release a child to a non-custodial parent, "acted with deliberation and made a considered judgment, . . . both [the principal] and the . . . [s]chool [d]istrict were protected by qualified immunity"); *Mills v. Hankla*, 297 P.3d 158, 173 (Alaska 2013) (concluding that because a city "act[ed] with 'deliberation, decision and judgment,' " its hiring decision "f[ell] within the protection of discretionary function official immunity" (quoting *Pauley*, 31 P.3d at 1285)).

challenges a "planning" decision.[54] Thus, the superior court should have considered whether the actions complained of — Marlow's allegedly inconsistent instructions regarding alcohol use and her alleged "failure to properly supervise" Valle — were "planning" or "operational," not whether they involved Marlow's "deliberation" and "judgment." We consider this question next.

### 2. It was error to dismiss Lane's negligent supervision claim on the basis of discretionary function immunity.

To reiterate, "planning" generally refers to policymaking while "operational" generally refers to the implementation of policy or the "day-by-day operations of the government."[55] Lane's claims appear to involve both. According to Lane, Marlow gave Valle "mixed messages" about alcohol use at the campground. The campground rules strictly prohibited alcohol, but Marlow testified there was a common understanding that Valle could drink in the privacy of his tent and should ignore "minor" drinking by others as long as it did not bother anyone else. Lane argues that Marlow's instructions misled and confused Valle, and that as a result Valle did not "intervene" to "shut down [the] drinking part[y]" at which Lane was shot. Lane argues that Marlow's allegedly negligent supervision of Valle was "an operational failure" for which the City is liable.

Marlow's decision to allow some limited drinking at the campground required her and other City officials to evaluate different policy goals and balance competing interests, including the campers' safety on the one hand and their personal

---

[54]    *Urethane Specialities v. City of Valdez*, 620 P.2d 683, 688 (Alaska 1980); *State v. Abbott*, 498 P.2d 712, 720-22 (Alaska 1972).

[55]    *Abbott*, 498 P.2d at 720 (quoting *Swanson v. United States*, 229 F. Supp. 217, 220 (N.D. Cal. 1964)).

autonomy and privacy on the other. The City also had to consider how operating the campground through the winter would affect its limited financial resources. Marlow testified that the City decided to keep the campground open in fall 2009 after a property owner evicted a large number of homeless people who then had "no place to go" because the local shelters were full. The City Manager decided that keeping the campground open was "the best of the limited alternatives."

Once the City made this decision, it was Marlow's responsibility to "manage" the winter campground and its population. The City chose not to provide additional services such as security patrols, because "making a meaningful change in the services offered would involve considerable expense at a time when the City had many other financial needs." Besides, Marlow testified that the City intended to "provide a housing option for people," not "run[] some sort of detention center." She therefore determined that strict prohibition of alcohol was neither practicable nor desirable, and she chose not to enforce the rule prohibiting alcohol consumption against people who weren't "causing any problem."

We have observed that "[i]mmunity remains if the injury results from a deliberate choice in the formulation of policy."[56] Marlow's decision concerning alcohol use at the campground was the result of deliberation and took into account various interests and objectives. We conclude that the decision to allow "minor" alcohol consumption so long as it did not "caus[e] . . . problem[s]" was a planning decision for which the City is immune.

But once the City decided to leave the campground open and allow some drinking in limited circumstances, it did not have the discretion to carry out these choices

---

[56]    *Id.* (quoting Joe R. Greenhill & Thomas V. Murto III, *Governmental Immunity*, 49 TEX. L. REV. 462, 472 (1971)).

negligently.[57]  Accordingly, we conclude that the City could be liable for Marlow's supervision of Valle, including her allegedly inconsistent instructions regarding alcohol use.  The routine supervision of personnel generally falls under the heading of the "day-by-day" business of government, for which the City does not enjoy sovereign immunity.[58]  And we do not think that allowing Lane's negligent supervision claim to proceed on the merits would frustrate the purposes of sovereign immunity.  The claim does not, for instance, require a court to second-guess the wisdom of allowing "minor" alcohol consumption; it merely asks whether Marlow exercised reasonable care in carrying out that policy.[59]  Such a matter is well within the expertise of Alaska trial courts.[60]  And our decision here will not expose municipalities to excessive or unwarranted liability, because the City's discretionary policymaking functions remain insulated from judicial review.[61]

We conclude that Lane's negligent supervision claim, alleging that Marlow's explanation of the campground alcohol policy to Valle was inconsistent and confusing, concerns an operational matter rather than a planning decision.  We therefore reverse the

---

[57]  *Id.* at 720-22.

[58]  *See State v. Stanley*, 506 P.2d 1284, 1291 (Alaska 1973) (concluding that State's "failure to exercise proper care," including the negligence of a supervisor, did "not rise to the 'level of governmental policy decisions' to which discretionary function immunity . . . applies").

[59]  *See Abbott*, 498 P.2d at 721-22.

[60]  *See id.*

[61]  *See id.*

superior court's grant of summary judgment on this issue and remand for further proceedings.[62]

### B. There Are Genuine Issues Of Fact As To Whether Valle Was Acting Within The Scope Of His Employment.

Lane also argues that the superior court erred in concluding that Valle's actionable conduct — specifically Valle's "failure" to disperse the "drinking party" at which Lane was shot — did not fall within the scope of Valle's employment with the City.[63] The superior court concluded that Valle was "simply socializing outside the scope of his work responsibilities," and that he did not intend by his conduct to "promot[e] the [City's] interests." But Valle's job duties as caretaker arguably required him to socialize with other campground residents. And while we agree that Valle neglected some of his work responsibilities on the evening of the shooting, we cannot conclude as a matter of law that Valle was acting outside the scope of his employment.

Before holding an employer legally responsible for an employee's conduct, a court must determine whether the employee's conduct was "so connected to his

---

[62] Lane also argues that the City's "failure to employ security was not . . . protected by immunity." He contends that the City had a "special relationship" with campground residents similar to that of a landowner or a common carrier, and that this special relationship "creat[ed] a duty to act." But the City's choice to forgo additional services like private security patrols was fundamentally a matter of resource allocation; it was therefore a planning decision for which the City is immune. *See Adams v. City of Tenakee Springs*, 963 P.2d 1047, 1051 (Alaska 1998) ("Decisions about how to allocate scarce resources are matters of policy immune from judicial review.").

[63] Although the parties disputed whether Valle was a City employee or an independent contractor, we assume for this analysis that Valle was an employee, as did the superior court. *See Lockwood v. Geico Gen. Ins. Co.*, 323 P.3d 691, 696 (Alaska 2014) ("We review rulings on motions for summary judgment de novo, 'reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor.'" (quoting *Lum v. Koles*, 314 P.3d 546, 552 (Alaska 2013))).

employment as to justify requiring . . . the employer [to] bear [the plaintiff's] loss."[64] We have therefore followed the traditional rule that an employer is liable for the torts of an employee only "while the [employee] is acting in the scope of his employment."[65] "[T]he scope of employment is a fact specific inquiry for the jury unless the facts are undisputed or lend themselves to only one conclusion."[66]

An employee's conduct does not fall outside the scope of employment simply because it is discouraged, or even prohibited.[67] We have noted that even crimes and intentional torts may be within the scope of employment if they serve the employer's interests, albeit "in a perverted sense."[68] For example, we have held that a union steward who incited a violent confrontation with a rival union was "motivated, at least in part," to serve his union's interests;[69] that a therapist's abusive sexual relationship with a patient could be found to be "incidental" to the therapist's professional duties;[70] and that a school

---

[64] *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 349 (Alaska 1982) (quoting *Fruit v. Schreiner*, 502 P.2d 133, 141 (Alaska 1972)).

[65] *Id.* (citing *Kastner v. Toombs*, 611 P.2d 62, 63 (Alaska 1980)).

[66] *Ondrusek v. Murphy*, 120 P.3d 1053, 1057 (Alaska 2005) (citing *Taranto v. N. Slope Borough*, 909 P.2d 354, 359 (Alaska 1996)).

[67] *Laidlaw Transit, Inc. v. Crouse ex rel. Crouse*, 53 P.3d 1093, 1099 (Alaska 2002) ("A wrongful act committed by an employee while acting in his employer's business does not take the employee out of the scope of employment, even if the employer has expressly forbidden the act." (quoting *Ortiz v. Clinton*, 928 P.2d 718, 723 (Ariz. App.1996))).

[68] *Williams*, 650 P.2d at 350.

[69] *Id.*

[70] *Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 348 (Alaska 1990).

bus driver with "trace amounts of marijuana" in her system acted within the scope of her employment because she nonetheless "carried out the very function [she] was hired to perform — driving a school bus."[71]  In each of these cases we noted the "flexible" and fact-specific nature of the scope-of-employment question.[72]

Lane alleges that Valle was supposed to "help . . . shut down drinking parties," that he failed to do so on the night of the shooting, and that his failure was therefore reasonably incidental to his job responsibilities.  Some facts appear to favor his position.

According to the Second Restatement of Agency, an employee acts within the scope of employment if the employee (1) performs the kind of work the employee was hired to perform, (2) acts within the employer's "authorized time and space limits," and (3) acts in order to further the employer's interests.[73]  Marlow testified that Valle was supposed to "interact" with guests and "be available" to them in the evening.  Valle also did not have established work hours.  A "reasonable person could discern a genuine

---

[71]     *Laidlaw Transit, Inc.*, 53 P.3d at 1096, 1099.

[72]     *Id.* at 1098-99 ("This court does not follow a rigid rule for determining when tortious conduct occurs within the scope of employment; rather, we apply 'a flexible, multi-factored test.' " (quoting *Doe*, 791 P.2d at 346)); *Doe*, 791 P.2d at 346 ("Applicability of *respondeat superior* will depend primarily on the findings of fact in each case." (quoting *Fruit v. Schreiner*, 502 P.2d 133, 141 (Alaska 1972))); *Williams*, 650 P.2d at 349 ("The determination as to when an employee's tort will be attributed to the employer depends primarily on the facts and circumstances of each case.").

[73]     *Williams*, 650 P.2d at 349 n.10 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(1)-(2) (AM. LAW. INST. 1958)).  We have "rejected the Second Restatement's view that each of the [section] 228(1)[] factors must be satisfied prerequisite to recovery, and noted instead that the importance of various factors" should be weighed by the fact-finder in each case.  *Doe*, 791 P.2d at 347  (emphasis omitted) (citing *Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761, 764 & n.14 (Alaska 1973)).

factual dispute"[74] as to whether by "socializing" with other campground residents in the evening Valle was performing the kind of work he was hired to perform and was acting within "authorized time and space limits."

The superior court concluded, however, that Valle did not act to further the City's interests. The court's conclusion has significant support in the record. As caretaker, Valle was supposed to tell groups of campers drinking in the open to "take it elsewhere" or "shut it down." But rather than doing this with Lane and the others on the night of Lane's injury, Valle joined them. The campground rules prohibited drinking, and Marlow told Valle to "turn a blind eye to minor consumption." But Valle did far more than "turn a blind eye," and Lane's group apparently consumed more than a "minor" amount of alcohol. Valle provided the group with money to buy beer, and he drank so much that it "took [his] judgment away." The campground rules strictly prohibited firearms, but Valle nevertheless gave the group of intoxicated campers access to his two loaded pistols.

We cannot, however, conclude as a matter of law that Valle's conduct was not "reasonably incidental" to his employment. Valle was supposed to "be available" to campers; he was essentially the City's regular liaison and representative at the campground. He testified that he was "off the clock," but in fact he had no set work hours; he was neither on nor off the clock at any given time. And as Lane points out, Valle's mere presence at the campground may have benefitted the City. Our precedent has established that an employee who exercises poor judgment or does his job while intoxicated may nevertheless act within the scope of his employment.[75] And Valle's poor

---

[74]  *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014).

[75]  *See, e.g.*, *Laidlaw Transit, Inc.*, 53 P.3d at 1099.

judgment in this case does not conclusively demonstrate that his behavior on the night of the shooting was not "reasonably incidental" to his work responsibilities. One could argue that Valle was doing his job but doing it poorly.

We therefore conclude that the superior court erred in granting summary judgment on Lane's vicarious liability claim. "[T]he scope of employment is a fact specific inquiry for the jury unless the facts are undisputed or lend themselves to only one conclusion."[76] Some of the facts in the record support the superior court's conclusion, but others do not. We will affirm a grant of summary judgment only when "no reasonable person could discern a genuine factual dispute."[77] Because a genuine factual dispute exists here, we reverse the superior court's grant of summary judgment on Lane's vicarious liability claim and remand for further proceedings.[78]

---

[76] *Ondrusek v. Murphy*, 120 P.3d 1053, 1057 (Alaska 2005) (citing *Taranto v. N. Slope Borough*, 909 P.2d 354, 359 (Alaska 1996)).

[77] *Christensen*, 335 P.3d at 520 (citing *Yurioff v. Am. Honda Motor Co.*, 803 P.2d 386, 389 (Alaska 1990); *Semlek v. Nat'l Bank of Alaska*, 458 P.2d 1003, 1007 (Alaska 1969); *Isler v. Jensen*, 382 P.2d 901, 902 (Alaska 1963)).

[78] As an alternative ground for affirmance, the City argues that it cannot be held liable for Barrios's intentional criminal act absent a special relationship between itself and Lane, citing authority including *Hurn v. Greenway*, 293 P.3d 480, 483-84 (Alaska 2013), for the proposition that "a person generally has no duty to protect others from harm by a third party." But at the very least there is an exception to these general rules "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." *Id.* at 484 (quoting RESTATEMENT (SECOND) OF TORTS § 302B cmt. e (AM. LAW INST. 1965)). An example of such an "affirmative act" is when "[t]he actor provides the instrument of the crime to the criminal." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 302B cmt. e.) On the record before us, we are not convinced of the absence of a genuine issue of material fact as to whether Valle's

(continued...)

## V.    CONCLUSION

We REVERSE the superior court's grant of summary judgment on (1) Lane's claim that Marlow negligently supervised Valle by sending "mixed messages" about alcohol; and (2) Lane's vicarious liability claim against the City based on Valle's conduct.  We conclude that both claims raise genuine issues of material fact, and we therefore REMAND to the superior court for further proceedings consistent with this opinion.  We otherwise AFFIRM the judgment of the superior court.

---

[78]    (...continued)
provision of the pistols exposed other campers "to a recognizable high degree of risk of harm."  *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 302B cmt. e).  We also note Marlow's testimony that the campground's residents included people who had been excluded from homeless shelters because of previous incidents of violence.

STOWERS, Chief Justice, dissenting in part.

There is an adage that no good deed goes unpunished. The court's decision holding that there is a genuine issue of material fact whether the City is vicariously liable for Valle's conduct perfectly illustrates this point. The City, in an effort to provide some type of winter housing for homeless people in the City, kept open over the winter a campground that generally served to provide accommodations for transient workers in the summer. The City evidently recognized the need for a point of contact between itself and the campground residents and hired a campground caretaker, asking him to interact with campground residents as part of his duties. Presumably because the City saw the necessity of its caretaker interacting with campground residents and the need for the caretaker to be effectively on call all the time, the City did not set explicit work hours for the caretaker.[1] All of the City's decisions were reasonable. In fact it is hard to imagine a caretaker of any campground who would not be available more or less at all times to interact with campground guests or in the event of emergencies.

Under the court's decision today, the City is unable to prevail on summary judgment on the issue of vicarious liability precisely *because* it made reasonable choices about staffing the campground. The court holds today that the City might be vicariously liable for the caretaker's action *because* he was expected to "socialize with other campground residents," to " 'interact' with guests and 'be available' to them in the evening." Under this rule, no rational policymaker would ever make the decision the City made here because there is simply no way to cut off the City's potential for vicarious liability involving social interaction without expensive and time-consuming litigation that takes public resources from other public needs.

---

[1] Like the court, I assume for purposes of this analysis that the caretaker was a City employee and not an independent contractor.

Valle, the campground caretaker here, thinking he was "off the clock," actively participated in a drinking party that was unquestionably a violation of the City's campground rules and, because the drinking "took [his] judgment away," showed other members of the party loaded guns he had brought to the campground, also in violation of City campground rules. Another resident, Barrios, used one of these guns to shoot Lane, who survived but was injured. I cannot agree that the facts of this case can lead to any other conclusion but that Valle's actions did not further his employer's interests. In fact his actions were detrimental to the City's interests in providing homeless individuals a place to camp legally during the winter. Because I see no material factual dispute on this question, I would hold that the City cannot be vicariously liable for Valle's actions.

The way the court frames the issue about both Valle's actions and the City's interests leads to its erroneous analysis. As we said in *Williams v. Alyeska Pipeline Service Co.*, when considering an employer's vicarious liability, the question is whether the employee's "acts were sufficiently associated with the [employer] to justify imposing liability on the [employer]."[2] While the court emphasizes the benefits to the City of Valle's socializing with campground residents and attempts to characterize the issue as whether Valle's participation in the drinking party was merely "poor judgment" that could show only "that Valle was doing his job but doing it poorly," it neglects to explain how allowing his companions, most of whom were drunk, to "pass[] . . . around" loaded guns and then "shooting [the guns] up in the air and carrying on" himself could possibly be sufficiently associated with his employment to impose liability on the City. Even accepting that a campground caretaker is effectively never outside "authorized time and

_____

[2]     650 P.2d 343, 349 (Alaska 1982).

space limits" while at the campground,[3] sharing loaded firearms with campground residents cannot reasonably be considered conduct Valle was employed to perform.[4] Nor does the court explain how Valle's shooting in the air and allowing another resident to take turns shooting with him could ever serve the City's purpose and not his own personal interests.[5]

We may have a very liberal standard for surviving summary judgment,[6] but there must be some point at which common sense comes into play to foreclose finding a material issue of fact. Here Valle's actions went beyond interacting with guests and being available to them in the evening. He drank excessively and contributed money so that he and other revelers could continue drinking. Valle — at least according to Lane — shot the gun into the air himself and allowed Barrios to take turns shooting with him before Barrios turned the gun on Lane. These actions, which were crucial links of the causation chain in Lane's injury, can by no stretch of the imagination be considered part of Valle's job, nor can they be said to further the City's interests. Only by ignoring Valle's firearms misconduct and concentrating on his drinking can the court reach the untenable conclusion that a material issue of fact remains about whether the City is vicariously

---

[3]    *See id.* at 349 n.10 (setting out factors to evaluate employee conduct for vicarious liability).

[4]    *Id*.

[5]    *Id.*

[6]    *See Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 521 (Alaska 2014) (describing summary judgment standard as "low").

liable for Valle's actions. In deciding whether a genuine issue of material fact exists, we cannot exclude critical facts to discern a material factual dispute.[7]

If the court's result in this case is compelled by our precedent — and I would hold that it is not so compelled — then it may be time to reexamine the rules we have established. We have liberally construed the "motivation to serve" test, interpreting it to be met by showing that the "tortious conduct arises out of and is reasonably incidental to the employee's legitimate work activities."[8] We elaborated by saying that "the act which leads to the tortious behavior cannot be different in kind from acts the employee is authorized to perform in furtherance of the employer's enterprise."[9] Thus we held that a counselor who, in order to do his job effectively, needed to establish "transference" with his patient but then abused the "transference phenomenon" had engaged in conduct that met the standard.[10] And in the case of a school bus driver who negligently drove a school bus after using marijuana, we noted that negligent driving, not

---

[7]     For the same reasons, I disagree with the court's dismissal of the City's argument that it cannot be held liable for Barrios's intentional criminal act of shooting Lane. Leaving aside the fact that we have never adopted the "general rules" the court discusses, *see Hurn v. Greenway*, 293 P.3d 480, 484 (Alaska 2013) ("Unlike § 315, we have never adopted § 302B."), the question whether "Valle's provision of the pistols exposed other campers 'to a recognizable high degree of risk of harm' " does not resolve the question of the *City's* liability for the shooting. Even if Valle's actions did expose other campers to a recognizable degree of risk of harm, for the City to be vicariously liable, giving others access to loaded firearms must have reasonably been related to Valle's job or the City's interests.

[8]     *Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 348 (Alaska 1990).

[9]     *Id*. at 348 n.7.

[10]     *Id.* at 345, 348.

drug use, was "the conduct giving rise to the punitive damages award."[11] Finally, we held that a union was vicariously liable for the actions of its steward who incited the violent beating of another union's member when the steward (1) used his position of authority to call a union meeting at a time and place intended to provoke a confrontation, (2) "had no personal motive for his activities," and (3) "was, in a perverted sense, resolving a grievance held by some of the union's members."[12]

Why is it that bringing loaded guns into the campground, showing them to fellow inebriates, and shooting them are not "different in kind from acts [Valle was] authorized to perform in furtherance of [the City's] enterprise"?[13] Why did Valle not have a personal motive for his actions? Or to put it another way, what motivation to serve the city prompted Valle's weapons misconduct?[14] While the City may have expected Valle to "interact" with guests, the type of interaction that led to this shooting was well beyond anything the City might have contemplated. If this conduct can reasonably be considered socializing or interacting with campground guests that served the City's purpose, we may need to reconsider our legal test for vicarious liability. And if our summary judgment standard is so low as to require a trial on the facts presented here, it may also be time to consider whether we have set the "summary judgment survival" bar too low.

---

[11]    *Laidlaw Transit, Inc. v. Crouse ex rel. Crouse*, 53 P.3d 1093, 1098 (Alaska 2002).

[12]    *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 350 (Alaska 1982).

[13]    *See Doe*, 791 P.2d at 348 n.7.

[14]    *See Veco, Inc. v. Rosebrock*, 970 P.2d 906, 924 n.36 (Alaska 1999) (modifying *Doe* to explicitly require some purpose to serve the employer).

Because I cannot agree that a material issue of fact remains on the question of vicarious liability, I respectfully dissent from part IV.B of the court's opinion. I agree with the remainder of the court's opinion.